**HINDIN/OWEN/ENGELKE, INC., Plaintiff,**

v.

**GRM INDUSTRIES, INC., a Tennessee corporation, Defendant.**

No. 93 C 4771.

United States District Court, N.D. Illinois, Eastern Division.

Oct. 24, 1994.

Ruling Denying Reconsideration Nov. 18, 1994.

David A. Axelrod, Schoenberg, Fisher & Newman, Ltd., Mark David Wetterquist, Chicago, IL, for plaintiff.

Marty Jay Schwartz, Marty J. Schwartz, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

At the time the events occurred leading up to this law suit, defendant, GRM Industries, Inc. ("GRM"), was indebted to Comerica Bank ("Comerica") for loans totaling $23,000,000. GRM was in arrears and Comerica was pressing for payment. Comerica suggested that to avoid foreclosure GRM refinance the loans elsewhere and gave GRM a list of six firms, including plaintiff, Hindin/Owen/Engelke, Inc. ("Hindin"), to assist GRM in obtaining refinancing.

On March 24, 1992, GRM entered into an engagement agreement under which Hindin was hired to act as GRM's exclusive agent to obtain refinancing for the Comerica debt. The agreement was drafted by Hindin using its customary form. The agreement provided that GRM would pay Hindin a finder's fee of $200,000 if the latter was able to obtain a commitment, or under certain circumstances a proposal for a commitment, of a credit facility "in the approximate amount of $23,-000,000" with a facility fee of "approximately 1 to 1–½ points." The amount of the finder's fee, the amount of the credit facility, and the points limitation was set forth on an attachment to the agreement referred to as "Schedule A."

In the event Hindin obtained a commitment or a proposal within the range of the above amounts, GRM was obligated to use its best efforts to bring the financing to fruition. GRM's failure to use its best efforts would entitle Hindin to its finder's fee even if the refinancing did not go forward. Paragraph 4.1 of the agreement governed when the company failed to use its best efforts after receiving a commitment or proposal. Specifically, paragraph 4.1 provided as follows:

4.1 Finder's Fee Due in the Event the Company Fails to Use Its Best Efforts After Receiving a Proposal of Financing. It is further understood and agreed that such Finder's Fee shall be deemed immediately earned, and shall be immediately due and payable by the Company, in the event that: (i) a Lender during the term of this agreement makes a funding commitment within the range of terms set forth in Schedule A which the Company accepts, rejects, fails to act upon, or allows to expire without accepting it; (ii) the Company, for any reason rejects, fails to accept, or fails to take such steps as may be required by the Lender to convert a non-binding proposal of financing into a lending commitment which may be submitted to the Company by any Lender during the term of this agreement and which proposal of financing contains terms within the range set forth in Schedule A plus such other terms as are customary for transactions of this type; (iii) the Company, by reason of its acts or omissions, fails to consummate or prevents the consummation of the financing contemplated by any such proposal of financing or funding commitment; (iv) the Company after receiving a non-binding proposal of financing within the range of terms set forth in Schedule A does not permit a Lender to engage in or complete its due diligence, or fails to accept the Lender's appraised value of the Company's collateral; (v) the Company, for any reason, decides to terminate or materially alter its attempt to obtain financing, after receiving a non-binding proposal of financing within the range of terms set forth in Schedule A; (vi) the Company fails to use its best efforts to obtain a funding commitment from a Lender after it receives a non-binding proposal of financing within the range of terms set forth in Schedule A; or (vii) a Lender makes a funding commitment that is not within the range set forth in Schedule A, but is reasonable by lending industry standards, given the company's then existing financial condition and collateral base, which the Company accepts, rejects, fails to act upon, or allows to expire without accepting it.

All of the scenarios require a commitment or proposal for financing within the range set forth in Schedule A except number (vii). The difference between a proposal and a commitment is that a proposal is issued prior to a lender performing its field audit and due diligence study and is not binding on the lender until a commitment is issued. A commitment, on the other hand, is a binding agreement to lend a specific amount of money if the borrower meets certain stated conditions.

On June 29, 1993, during the term of the agreement, Congress Financial Corporation ("Congress") issued a proposal to GRM for a revolving line of credit in the amount of $8,000,000 and a term loan in the amount of $1,500,000. The proposal also included a closing fee of 1.5 points and an annual servicing fee of $40,000. The term of the loan was three years. The proposal included a condition that Comerica refinance "not less than $13,500,000" of the outstanding indebtedness. This proposal was accepted in writing by

GRM on July 2, 1993. No commitment was ever issued by Congress.

Both GRM and Hindin negotiated with Comerica about refinancing the portion of the debt required under Congress' proposal. The parties dispute whether Comerica agreed to refinance. It is, however, undisputed that Comerica did not issue a written proposal or commitment for any amount of refinancing. Hindin contends that Comerica orally proposed to refinance between $12,000,000 and $14,000,000 of its loan to GRM. The evidentiary basis for this assertion is the deposition testimony of Stephen Pinsly ("Pinsly"), president of GRM, and Geary Meunch ("Meunch"), assistant vice president of commercial loans for Hindin. Pinsly testified as follows:[1]

Q. At that time, had Comerica Bank agreed to retain twelve million dollars of the financing, or continue to finance twelve million dollars, based on the stock as collateral?

A. We felt they would.

Q. When you say, "we," who do you mean?

A. Management at GRM.

Q. Did you discuss that issue with Mr. Meunch at Hindin/Owen/Engelke?

A. Yes.

* * * * * *

Q. Did you have contact with anyone at Comerica Bank, Mr. Laplant or anybody else, that made you believe that Comerica could agree to continue a financing obligation of twelve million dollars?

A. Steve Laplant.

* * * * * *

Q. With respect to the issue of continued financing by Comerica Bank, what did Mr. Laplant say to you and what did you say to him?

A. I asked him if he would be interested, would the bank consider taking a position on the Johnston Industry stock, if we could reduce their loan to a about twelve or thirteen million dollars. He didn't commit

the bank to a number. He had hoped the number would be in the area of fourteen million dollars, but we were basically negotiating at that time. He said they would look somewhat favorable, but he couldn't commit the bank.

* * * * * *

Q. During June and July of 1993, did you have contact with Mr. Laplant or anybody else at Comerica Bank as to the viability of Comerica continuing to finance twelve or thirteen million dollars portion based on the stock as collateral?

A. I don't specifically recall any negotiations that I might have had with Comerica Bank at the time, but—

Q. But it was your understanding that it was certainly something that was going to be considered by Comerica Bank at that time?

A. I thought it was doable.

Meunch testified as follows:

Q. Tell me what you recall.

A. As far as restructuring of the debt?

Q. Yes.

A. As we got into the credit and brought some lenders in, the feeling was that we could replace the—what we call the senior portion of the debt, which would be the working capital facility, the revolving line of credit, and the term loan and do that first, having them stay in against the stock of the company, as sort of a—as a step-by-step situation and they thought it was a good idea because they basically said, if you can reduce our exposure, then we feel comfortable secured by the stock at a reduced exposure.

* * * * * *

Q. How much did Comerica Bank say they would feel comfortable staying in, being secured by the Johnston stock?

A. Well, basically they said get as much as you can, if we can get close, and then what we did was, when we got the Congress proposal—

1. The following dialogues are taken from those portions of the record relied upon by Hindin in its Rule 12M statement in support of its assertion that Comerica agreed to retain a portion of its loan.

Q. Yes.

A. —showed them the amounts, explained to them the amounts, and they were agreeable that the balance of that, you know, against the stock would be acceptable.

Q. Okay, who was agreeable? Who did you have this conversation with after you got the Congress proposal?

A. It was Mike Christophchek. I think it's Mike.

Q. Did you ever get anything in writing from Comerica Bank regarding what they would find acceptable in terms of restructuring?

A. No, nothing from Comerica. No.

\* \* \* \* \* \*

Q. Do you recall the specifics of your conversation with Mike Christophchek with respect to the Congress proposal?

A. Not the specifics, but the basic understanding, we went through the credit facility $8 million, 8 or $9 million revolver, million and a half term loan, and then Congress would take a portion of the stock as additional collateral and that the remaining stock would be Comerica's—had a first lien on it and at that point I think we just ran some numbers as far as what their exposure would be and he said that makes sense to them.

Q. Do you know if Christophchek had authority to agree to the type of structuring that you discussed with him?

THE WITNESS: I don't know.

Q. Did you ever [sic] any conversations whether it would have to go through a loan committee at Comerica Bank?

A. I don't know.

On or about July 23, 1993, GRM sold its operating assets to a third party, negating any refinancing need. GRM, therefore, did not pursue the line of credit and term loan proposed by Congress and Hindin ceased working on the refinancing with Comerica.

Hindin contends that by virtue of the foregoing, it satisfied paragraph 4.1 of the agreement by procuring proposals for a credit facility in the approximate amount of $23,-000,000, and thereby is entitled to its finder's

fee. Alternatively, Hindin claims that GRM waived the $23,000,000 requirement of Schedule A. Hindin has moved for summary Judgment. GRM denies that Hindin satisfied paragraph 4.1, denies that it waived anything, denies that Hindin is entitled to a finder's fee, denies that Hindin is entitled to summary judgment, and has itself moved for summary judgment.

## THE CONTENTIONS OF THE PARTIES

The parties agree that paragraph 4.1 governs the disposition of this case. If Hindin satisfied any one of the 7 scenarios set forth in paragraph 4.1, it is entitled to a finder's fee; if it did not, it is not entitled to a finder's fee.

Hindin does not dispute that Congress issued a non-binding proposal rather than a commitment. Therefore, scenario numbers (i) and (vii) of paragraph 4.1 are not involved. Scenario numbers (ii) through (vi) each require that the proposal be in an amount "within the range of terms set forth in Schedule A." As we have seen, Schedule A states that the amount of credit is to be "in the approximate amount of $23,000,000" at "approximately 1 to 1-½ points." The Congress proposal totaled $9,500,000. Thus, it standing alone, would not meet the requirements of any of the scenarios (ii) through (vi).

Hindin, however, claims that it obtained a proposal from Comerica that it would retain approximately $12,000,000 to $14,000,000 of its original $23,000,000 loan to GRM and, when added to the $9,500,000 proposal from Congress, equals a total proposal of between $21,500,000 and $23,500,000, which is within the range set forth in Schedule A. Hindin admits that Comerica did not propose a written restructuring of its loan, but it insists that Comerica orally agreed to the restructure. This, Hindin contends, entitles it to the finder's fee because when GRM sold its production assets it certainly decided "to terminate . . . its attempt to obtain financing" after receiving a non-binding proposal of financing within the range of terms set forth in Schedule A as set forth in scenario (v).

One could legitimately question whether $21,500,000 is in the "approximate amount of $23,000,000" but GRM does not do so. It, instead, makes two other arguments on why Hindin fails to make a case: Hindin is trying to recover on an unplead theory because it failed to plead that it procured a proposal from Comerica in its complaint (*Rosenfeld v. Lion Mfg. Corp.*, 253 F.2d 90, 93 (7th Cir. 1958)); and, alternatively, Hindin did not obtain a proposal from Comerica and, therefore, did not produce proposals in the range of the amount set forth in Schedule A.

## DISCUSSION

■ GRM's first argument fails because Hindin is not trying to recover on an unplead theory. Its theory of recovery is breach of contract, to wit: that GRM violated the provision in the March 24, 1992, agreement to pay a finder's fee for obtaining a refinancing proposal. All that Rule 8 requires is fair notice of the nature and basis of the claim and a general indication of the type of litigation involved. 5 Wright & Miller, *Federal Practice & Procedure: Civil 2d* § 1215. Here, the complaint advises GRM that it owes Hindin a finder's fee because the latter obtained a financing proposal as called for under the agreement of March 24, 1992. This is sufficient.

However, GRM's second ground is made of sterner stuff. Hindin has to rely on an alleged oral proposal from Comerica to satisfy the amount requirement of Schedule A. To support its motion for summary judgment and to defeat GRM's motion, it was incumbent upon Hindin to come forth with some evidence in a form authorized by Rule 56(c) that it actually obtained a proposal from Comerica. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). It relies on the deposition testimony of Pinsly, executive assistant to the chairman of the board and chief financial officer for GRM, and Meunch, a Hindin associate responsible for the GRM project, which is set forth *verbatim* above.

■ GRM objects to the deposition testimony on the grounds of hearsay, *i.e.*, the testimony of Pinsly and Meunch is being offered to prove what someone else, *viz.*, Steve Laplant ("Laplant") and Mike Christophchek ("Christophchek"), employees of Comerica, said on behalf of Comerica. Hearsay is not competent evidence either in support of or in opposition to a motion for summary judgment. *Redd v. Fisher Controls*, 814 F.Supp. 547, 552 (W.D.Tex.1992). But is this testimony hearsay? [2] The statements of a declarant of his intention to enter into a contract and to its terms have been held to be more in the nature of verbal acts and, therefore, not inadmissible hearsay. *Creaghe v. Iowa Home Mut. Cas. Co.*, 323 F.2d 981 (10th Cir.1963), *Prosser v. U.S.A.*, 265 F. 252 (8th Cir.1920). For example, the proposal made by Congress is an out of court written declaration but is, nevertheless, admissible as a verbal act. But neither Laplant nor Christophchek individually intended to make a proposal. The proposal was to come from Comerica. They could only pass along what they had been authorized to propose by Comerica. This is made clear by Christophchek when he told Meunch that the suggestion that Comerica continue to finance the balance of the loan after Congress' money was used to pay off the senior debt "made sense to *them*" and when he said "*they* [Comerica] were agreeable to the balance of that, you know, against the stock would be acceptable." (emphasis supplied). A statement by an employee that his employer agrees to make a proposal would be a statement offered for the truth of the matter asserted, *i.e.*, that his employer agreed to make a proposal, and constitutes hearsay. *T. Harris Young & Assocs. v. Marquette Electronics*, 931 F.2d 816 (11th Cir.1991).

However, the statements of Pinsly, an officer of GRM, would be excluded from hearsay by Rule 801(d)(2)(D) as a statement of a party's agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship. However, Pinsly testified that Laplant "didn't commit the bank to a number";

---

**2.** All deposition testimony is technically hearsay. However, Rule 56 provides for the use of deposi- tions in summary judgment proceedings.

that they were "basically negotiating at the time"; and that "he [Laplant] couldn't commit the bank." This testimony clearly does not support the existence of a proposal from Comerica.

However, hearsay aside, even considering the testimony of Pinsly and Meunch, it is clear that no proposal was made by Comerica through either Laplant or Christophchek to Pinsly and Meunch. While there does not seem to be any reason why a financing proposal could not be verbal (and GRM does not suggest that there is a reason), it is hard to imagine that a sophisticated lending entity like Comerica would do so.[3] In any event, the testimony of Pinsly and Meunch falls far short of establishing anything beyond very preliminary negotiations with Comerica. A specific dollar amount had not been decided upon and no discussion of the points Comerica would demand had yet occurred. In sum, there is no evidence that Comerica made a proposal to GRM to refinance any portion of the loan. All that was offered was evidence of very preliminary discussions and which might led one to be optimistic that a proposal from Comerica would be forthcoming. Therefore, Hindin has failed to come up with any evidence that it met any of the scenarios of paragraph 4.1 which would entitle it to a finder's fee.

Hindin next argues that by agreeing to the Congress proposal, GRM waived strict compliance with the engagement agreement. *Whalen v. K-Mart Corp.*, 166 Ill.App.3d 339, 116 Ill.Dec. 776, 779, 519 N.E.2d 991, 994 (1st Dist.1989). This might have been arguable if the agreement did not include sub-paragraph (vii). The engagement agreement considered the possibility that GRM's financial condition might not support $23,000,000 under lender industry standards. In order to be entitled to a finder's fee for obtaining funding less than the amount stated in Schedule A, Hindin must establish that the amount to be financed was reasonable by lender industry standards given GRM's financial condition, and must produce a commitment for financing rather than a proposal. Here, Hindin got a proposal, not a commitment, from Congress for the $9,500,000.

Hindin could have insisted that "proposal" be substituted for "commitment" in sub-paragraph (vii) when the engagement agreement was drafted but it did not do so. Waiver requires an express or implied voluntary and intentional relinquishment of a known and existing right. *Whalen v. K-Mart Corp.*, 166 Ill.App.3d 339, 116 Ill.Dec. 776, 519 N.E.2d 991 (1st Dist.1988). Payment of a finder's fee to Hindin is an obligation or a duty and not a "right" possessed by GRM. A "right" has been defined as a legally enforceable claim of one person against another, that the other shall do or not do a given act. *Black's Law Dictionary 5th Edition*, 1979, p. 1189. An obligation or duty is "a correlation of a right." *Id.* An obligation can only be waived by the obligee. An additional obligation can only be incurred by an obligor by modification of his contract which must meet all of the requirements of contract law. *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198, 202 (7th Cir.1985). Although Hindin does claim as an alternative to waiver that the parties modified the agreement, it has introduced no evidence of modification. Hindin has also not pleaded modification in its complaint. *Rosenfeld v. Lion Mfg. Corp.*, 253 F.2d 90, 93 (7th Cir.1958).

Inasmuch as Hindin has brought forth no proof that it is entitled to a finder's fee under the engagement agreement, there is no issue of fact on Count I, breach of contract. GRM's motion for summary judgment is granted and Hindin's motion for summary judgment is denied.

Hindin seeks recovery in Count II on a theory of unjust enrichment/*quantum meruit*. Hindin failed to contest GRM's motion for summary judgment on this count so summary judgment is granted on Count II also.

---

3. For example, the proposal from Congress consisted of 6 single-spaced typed pages filled with minute details (plaintiff's dep. ex. 18). The CIT Group/Credit Finance, Inc., appears to have made a proposal to make a proposal and it consisted of 8 single-spaced pages (defendant's dep. ex. 11).

## CONCLUSION

Summary judgment is granted to GRM on Counts I and II of Hindin's complaint. Hindin's motion for summary judgment is denied.

IT IS SO ORDERED.

### RULING ON RECONSIDERATION

■ The court entered summary judgment against plaintiff on October 21, 1994. Plaintiff filed a motion styled "Motion for Reconsideration" on November 4, 1994. Plaintiff has specified Rule 60 as the basis for the motion. This is curious because the motion appears to have been filed within 10 days as required by Rule 59(e), a much more liberal rule for permitting reconsideration. According to the affidavit of service, the motion was served on defendant on November 4, 1994. Rule 6 provides that "[w]hen the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation." Thus, it looks to have been served within ten days. The Seventh Circuit has adopted a bright-line test to determine whether a motion challenging a judgment on the merits should be considered under Rule 59(e) or Rule 60. *U.S. v. Deutsch*, 981 F.2d 299, 300 (1992). "Under which rule the motion falls turns on the time at which the motion is served. If the motion is served within 10 days of the rendition of judgment, the motion falls under Rule 59(e); if it is served after that time, it falls under Rule 60(b)." *Id.*

■ A motion for reconsideration under Rule 60(b) must be shaped to the specific grounds for modification or reversal enumerated in the rule. It may not be a mere general plea for relief. *Deutsch*, 981 F.2d at 301. Because plaintiff does not seek relief because of excusable neglect, newly discovered evidence, fraud, or any other of the typical bases of a Rule 60(b) motion, the motion under this rule would be denied out of hand. However, since the motion does appear to have been filed within the 10 days allowed by Rule 59(e), the court will consider the motion as one filed under that less stringent rule.

Plaintiff contends that the court erred in three respects: (1) when it failed to find waiver, (2) when it found that plaintiff had not proved entitlement to a fee under the paragraph 4.1 of the contract, and (3) when it failed to find a question of fact concerning modification.

### Waiver

The basis of the court's ruling of no waiver was because the contract specifically provided that no finder's fee was due under the circumstances shown by plaintiff's Rule 12M statement. The agreement provided that plaintiff was due a finder's fee if its efforts produced financing "within the range," *i.e.*, $23 million. The contract considered the possible predicament where plaintiff would produce a proposal for financing which did not come into fruition because of actions or inactions of the defendant. *See* paragraph 4.1. This paragraph provides for a finder's fee under seven specific circumstances, even though defendant did not ultimately receive financing. Six of the seven require plaintiff to produce proposals or commitments for financing within the range. Only one circumstance (sub-paragraph (vii)) provides for a finder's fee where plaintiff is unable to produce a loan within the range. However, to be entitled to a finder's fee under this subsection plaintiff must produce a commitment. A proposal is not a commitment. The subparagraph does not say that plaintiff has earned a finder's fee when it produces a proposal for less than the full amount but is prevented from obtaining a commitment by actions of defendant. It is not up to the court to rewrite plaintiff's contract to cover a situation it did not anticipate [1].

■ Plaintiff now claims that Stephen Pinsly ("Pinsly"), defendant GRM's president, waived this requirement when he orally agreed to pay the fee for obtaining the Congress' proposal if plaintiff would only continue in its efforts to obtain further financing while defendant attempted to sell the assets of the business. Unfortunately for plaintiff,

---

1. However, the use of the word "commitment" in sub-paragraphs (i) and (vii), as opposed to "proposal," which is used in sub-paragraphs (ii), (iii), (iv), (v), and (vi), would indicate that this scenario was probably anticipated because both words are terms of art.

this is the first time the court has heard of this alleged oral agreement. Plaintiff did not refer to this in either its Rule 12M statement, its Rule 12N statement, or in its briefs. It is, therefore, waived.

### Paragraph 4.1

Plaintiff contends that it qualified for its finder's fee under paragraph 4.1 because it obtained a proposal from Congress, the proposal was accepted by defendant, and defendant failed to take the necessary steps to convert it into a commitment. However, paragraph 4.1 provides seven instances where a fee is owed in the event defendant failed to use its best efforts after receiving a proposal or commitment for financing. Plaintiff qualifies under none of them. It obtained a proposal and not a commitment for a lesser amount. Thus, it failed to qualify under sub-paragraph (vii). It did not produce any evidence that it obtained proposals in the range of $23 million. It specifically produced no evidence that it obtained a proposal from Comerica to retain any portion of its loan. It is clear from the evidence that it did produce that there was no agreement as to either the amount or the points to be contained in any proposal. Therefore, it failed to qualify under any of the other six sub-paragraphs.

### Modification

Plaintiff's final argument is that Pinsly orally agreed to modify the agreement when he stated that plaintiff had earned its fee. As explained above, this was not raised in either the Rule 12M statement, the Rule 12N statement, or in the briefs, and is, therefore, waived.

### CONCLUSION

Plaintiff's Motion for Reconsideration is denied.

IT IS SO ORDERED.